**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| AMICA MUTUAL INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 10-CV-218-TCK-TLW |
| | ) |
| GIBBS ARMSTRONG BOROCHOFF | ) |
| MULLICAN & HART, P.C., GEORGE | ) |
| GIBBS, an individual, and GEORGE | ) |
| MULLICAN, an individual, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the Court is Defendants' Motion to Dismiss First Amended Complaint (Doc. 17), wherein Defendants move for dismissal of Plaintiff's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").

**I.    Background**

The following facts are alleged in Plaintiff's First Amended Complaint. Plaintiff Amica Mutual Insurance Company ("Amica") insured Larry Cantrell ("Cantrell") under a personal automobile insurance policy that provided uninsured/underinsured ("UM/UIM") coverage. Cantrell was a police officer for the City of Sapulpa and was killed in a motor vehicle accident while on duty on July 31, 2005. Iris Cantrell ("Mrs. Cantrell"), Cantrell's mother, was appointed personal representative of Cantrell's estate and contended that the accident was caused as a result of the negligence of an uninsured or underinsured motorist. Cantrell's estate submitted a UM/UIM claim to Amica as a result of the accident and death of Cantrell.

In February 2007, Amica retained Defendants Gibbs Armstrong Borochoff Mullican & Hart

("Law Firm") and George Gibbs ("Gibbs") for "coverage advice and additional advice with respect to Amica's investigation of the UM claim presented by [Mrs. Cantrell]." (First. Am. Compl. ¶ 8.) On March 13, 2007, Gibbs provided a written coverage opinion to Amica, concluding that uninsured motorist coverage did not apply to Mrs. Cantrell's claim. Specifically, Gibbs stated:

> We believe the police vehicle which your insured and his father occupied at the time of the accident does not meet the definition of an uninsured motor vehicle pursuant to the [P]olicy. Therefore, we feel the uninsured motorist coverage does not apply.

(*Id.* ¶ 9 ("First Coverage Opinion").) Amica alleges that the First Coverage Opinion was in error and that Gibbs drafted a second opinion ("Second Coverage Opinion") dated March 16, 2007, revising his opinion and concluding that "[Cantrell] would obviously meet the definition of an insured under the Uninsured Motorist Coverage Section Policy." (*Id.* ¶ 11.) However, Gibbs concluded that Amica's ultimate liability analysis was correct because "we have no reason to believe that (the other driver involved in the accident with Cantrell) was more than 50 percent at fault for the subject accident" based on (1) Oklahoma Highway Patrol's conclusion that "[C]antrell was traveling at an excessive rate of speed at the time of the accident and (2) the adverse driver was not in [Cantrell's] lane at the time [Cantrell] swerved to avoid a collision with the adverse vehicle." (*Id.* ¶ 13.) Amica relied on Gibb's advice and subsequently denied Mrs. Cantrell's claim. Amica also generally alleges that Gibbs advised Amica to "close its file without communicating its [denial] decision to Mrs. Cantrell" and "keep a low profile and let sleeping dogs lie." (*Id.*) In addition, Amica contends that Gibbs did not recommend hiring an accident reconstructionist or suggest that Amica pursue any additional avenues of investigation.

Mrs. Cantrell, as administratrix of Cantrell's estate, filed suit against Amica for bad faith and breach of contract on April 14, 2008 in Creek County, Oklahoma ("underlying action"). Law Firm

continued its representation of Amica, defending Amica against Mrs. Cantrell's suit. Specifically, Defendant George Mullican ("Mullican") handled the underlying action on behalf of Law Firm. Amica alleges that Mullican "was convinced that [Mrs. Cantrell's] bad faith claim was without merit and that the advice provided to Amica by Law Firm was sound." (*Id.* ¶ 15.) Amica further alleges that the lawsuit could have been settled for $200,000.00 but that Mullican discouraged any attempt to settle, instead recommending that Amica pursue discovery and eventually file a motion for summary judgment.

The underlying action was removed to this court on September 17, 2008 and assigned to the Honorable Judge Claire V. Eagan. Amica contends that "[b]y early 2009, [it] began questioning the advice it had been given by Law Firm, Gibbs, and Mullican." (*Id.* ¶ 18.) In March 2009, Amica reassigned the underlying action to another law firm and "became convinced that the advice it had been given by Law Firm, Gibbs[,] and Mullican was erroneous and that such advice had actually increased the value of Plaintiff's bad faith claim." (*Id.* ¶ 19.)

Amica filed a motion for summary judgment in the underlying action, which was denied by Judge Eagan. Judge Eagan found that there were genuine issues of material fact sufficient to preclude summary judgment on the breach of contract claim, including facts regarding the location of the vehicles involved in Cantrell's accident and Cantrell's speed. (*See* Doc. 126 in Case No. 08-CV-0546-CVE-PJC).[1] Judge Eagan also denied summary judgment on the bad faith claim, finding

---

[1] The Court's recitation of Judge Eagan's findings does not convert Defendants' Motion to Dismiss into one for summary judgment. Specifically, a court may "take judicial notice of its own files and records, as well as facts which are a matter of public record" without converting a motion to dismiss into a motion for summary judgment. *Tal v. Hogan*, 453 F.3d 1244, 1265 n. 24 (10th Cir. 2006) (citing *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000)).

that Mrs. Cantrell raised genuine issues of fact as to whether Amica "overlooked relevant material facts, and as to whether a more thorough investigation would have produced relevant information." (*Id.* 11.) Specifically, Judge Eagan cited questions of fact regarding whether Amica could have discovered additional relevant information had it hired its own accident reconstructionist. Judge Eagan also found:

> Mrs. Cantrell has also offered sufficient evidence from which a jury could find that [Amica] handled her claim in bad faith. Mrs. Cantrell has offered evidence that [Amica] originally was not going to investigate her claim at all[,] attempted to keep her from retaining an attorney[,] and closed her filed without communicating its decision to her in a timely manner. Mrs. Cantrell did not learn of [Amica's] decision until over a year and a half after she notified [Amica]. When discussing the insurer's duty of good faith and fair dealing the Oklahoma Supreme Court has stated that "[o]f particular importance is the delicate position of the insured after a loss is incurred. . . ." [*Buzzard v. Farmers Ins. Co., Inc.*, 824 P.2d 1105, 1109 (Okla. 1991).] Particularly in light of its knowledge that Mrs. Cantrell lost her son and husband, a jury could reasonably find that [Amica's] conduct towards Mrs. Cantrell was unreasonable under the circumstances.

(*Id.* 11-12.) The underlying matter was settled subsequent to Judge Eagan's summary judgment ruling and was therefore never tried to a jury. Amica represents that the settlement amount was "substantially in excess of $200,000.[00]" (*Id.* ¶ 23). Amica now brings suit against Defendants for contribution, professional negligence/legal malpractice, and indemnity. Defendants have moved to dismiss all claims.

## II.    Rule 12(b)(6) Standard

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief may be granted. The inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544)). In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must "'nudge [ ]

4

[his] claims across the line from conceivable to plausible.'" *Schneider*, 493 F.3d at 1177 (quoting *Twombly*, 550 U.S. at 570). Thus, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Schneider*, 493 F.3d at 1177.

The Tenth Circuit has interpreted "plausibility," the term used by the Supreme Court in *Twombly*, to "refer to the scope of the allegations in a complaint" rather than to mean "likely to be true." *Robbins v. Okla. ex rel. Okla. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008). Thus, "if [allegations] are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Id.* (internal quotations omitted). "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Id.* "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id.* at 1248. In addition, the Tenth Circuit has stated that "the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context," and that whether a defendant receives fair notice "depends on the type of case." *Id.*

## III. Contribution Claim

The right to contribution is set forth in Okla. Stat. tit. 12, § 832 ("Section 832"), which provides:

> A. When two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a

5

right of contribution among them even though judgment has not been recovered against all or any of them except as provided in this section.

B. The right of contribution exists only in favor of a tort-feasor who has paid more than their pro rata share of the common liability, and the total recovery is limited to the amount paid by the tort-feasor in excess of their pro rata share. No tort-feasor is compelled to make contribution beyond their pro rata share of the entire liability.

C. There is no right of contribution in favor of any tort-feasor who has intentionally caused or contributed to the injury or wrongful death.

D. A tort-feasor who enters into a settlement with a claimant is not entitled to recover contribution from another tort-feasor whose liability for the injury or wrongful death is not extinguished by the settlement nor in respect to any amount paid in a settlement which is in excess of what was reasonable.

E. A liability insurer which by payment has discharged, in full or in part, the liability of a tort-feasor and has thereby discharged in full its obligation as insurer, is subrogated to the tort-feasor's right of contribution to the extent of the amount it has paid in excess of the tort-feasor's pro rata share of the common liability. This provision does not limit or impair any right of subrogation arising from any other relationship.

F. This act does not impair any right of indemnity under existing law. When one tort-feasor is entitled to indemnity from another, the right of the indemnity obligee is for indemnity and not contribution, and the indemnity obligor is not entitled to contribution from the obligee for any portion of the indemnity obligation.

G. This act shall not apply to breaches of trust or of other fiduciary obligation.

H. When a release, covenant not to sue, or a similar agreement is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

1. It does not discharge any other tort-feasor from liability for the injury or wrongful death unless the other tort-feasor is specifically named; but it reduces the claim against others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is greater; and

2. It discharges the tort-feasor to whom it is given from all liability for contribution to any other tort-feasor.

Defendants argue that Amica's contribution claim fails under Rule 12(b)(6) because there is no "common liability" among Amica and Defendants to make them joint tortfeasors. (Mot. to Dismiss 6.) Specifically, Defendants maintain they cannot be a joint tortfeasor with Amica because there is no contractual or special relationship between Mrs. Cantrell and Defendants that would create a duty to Mrs. Cantrell on the part of Defendants. In response to this argument, Amica contends that Defendants owed a duty to Mrs. Cantrell because it was reasonably foreseeable that Mrs. Cantrell would be harmed by Defendants' actions. Amica does not provide, nor could the Court find, any case explicitly finding a duty to an insured by the attorneys of the insured's insurance company in conjunction with the preparation of a coverage opinion or the defense of a bad faith suit brought by the insured. Instead, Amica cites to various cases which it contends demonstrate a "trend in Oklahoma law to recognize a duty of care to an insured by persons/entities other than the insurer." (Resp. to Mot. to Dismiss 5.)

The Court is unwilling to find that Defendants owed a duty to Mrs. Cantrell based on the "trend" cited by Amica, *see Wofford v. E. State Hosp.*, 795 P.2d 516, 521 (Okla. 1990) (noting that the existence of a duty is a question of law for the court), as the cases cited by Amica in support of such a "trend" are distinguishable from the instant case. (*See* Resp. to Mot. to Dismiss 5-11 (relying on *Brown v. State Farm Fire and Cas. Co.*, 58 P.3d 217 (Okla. Civ. App. 2002), *Stroud v. Arthur Anderson & Co.*, 37 P.3d 783 (Okla. 2001), and *North Am. Specialty Insur. Co. v. Britt Paulk Agency, Inc.*, 511 F. Supp. 2d 1099 (E.D. Okla. 2007) to demonstrate said "trend").) For example, in *Brown*, the Oklahoma Court of Civil Appeals held that an insurance investigator, hired by an insurance company to investigate the cause of a fire at the insured's property, had a duty to the insured to conduct a fair and reasonable investigation. *See Brown*, 58 P.3d at 223. The court

7

therefore reversed the lower court's dismissal of the insured's negligence claim against the investigator, finding that the insured could bring a negligence claim based on the existence of such a duty. Although *Brown* generally suggests that not only the insurance company has a duty of care to its insured, the precise relationship at issue in this case – namely, that between the insured and the attorneys hired by the insurance company to write a coverage opinion and defend the insurance company against a bad faith suit by the insured – was simply not involved in *Brown*. The Court finds that the relationship between an insured and an insurance investigator is not similar enough to that between an insured and the attorneys representing the insured's insurance company so as to require expansion of *Brown* to the facts of the instant case. Similarly, the relationships involved *Stroud* and *Britt Paulk* are also of a different nature than that presented here. *See Britt Paulk*, 511 F. Supp. 2d at 1105 (permitting contribution claim brought by insurance company against *insurance agents* in conjunction with insurance company's settlement of bad faith claim); *Stroud*, 37 P.3d at 794 (holding that an *independent auditor's* duty of care in auditing a client's financial statements extends to persons other than the audit client where those third parties were foreseeable and it was known that they would rely on the agent's professional services).

In sum, Amica fails to provide authority for what would essentially amount to a new cause of action against attorneys representing insurance companies, and the Court is unpersuaded that the "trend" cited by Amica results in a duty on behalf of Defendants to Mrs. Cantrell. Therefore, because the Court fails to find such a duty, and because Amica has not asserted any other basis of

liability against Defendants, Defendants cannot be joint tortfeasors under Section 832, mandating dismissal of Amica's contribution claim.[2]

## IV. Professional Negligence/Legal Malpractice Claim

Defendants argue that Amica's professional negligence/legal malpractice claim ("negligence claim") is barred pursuant to the doctrine of *in pari delicto*. As stated in *Tillman v. Shofner*, 90 P.3d 582, 584 (Okla. Civ. App. 2004):

> The defense of *in pari delicto* has been recognized in Oklahoma. The Oklahoma Supreme Court has referred to the general and universal rule "that where parties to an immoral or illegal transaction are *in pari delicto* with each other, each is estopped, as to the other, to take advantage of recovering damages for injuries sustained as a consequence of their joint wrong. . . . And as between parties *in pari delicto* the law will aid neither, but will leave them as it finds them."

(citing *Bowlan v. Lunsford*, 54 P.2d 666, 668 (Okla. 1936)). The basis of the *in pari delicto* doctrine is that "the law will not lend its aid to a transaction in violation of law, and particularly to a participant, [as] no one knowingly participating in a transaction intended to accomplish a purpose forbidden by law can bring an action for any cause directly connected with that illegality." *Tillman*, 90 P.3d at 584-85 (citing *Brinley v. Williams*, 114 P.2d 463, 464-65 (Okla. 1941)).

Defendants argue that the *in pari delicto* applies in the instant case because "Amica violated its statutory duties to its insured by ignoring a claim and hoping that the client would not press the matter." (Mot. to Dismiss 17; *see id.* 8-9 (citing Okla. Stat. tit. 36 § 3629 (requiring insurer to submit written offer of settlement or rejection of claim to insured within ninety (90) days of receipt

---

[2] Defendants also argue that Amica's contribution claim fails because there is no right of contribution for a bad faith claim, there is no right of contribution for breach of a fiduciary obligation, and settlement bars Amica's contribution claim in this case. Because the Court agrees with Defendants that there is no common liability under Section 832, it need not address these arguments.

9

of proof of loss); Okla. Stat. tit. 36 § 1250.4(C) (requiring insurer to provide "adequate response" to claimant within thirty (30) days of receipt of written communication); Okla. Stat. tit. 36 § 1250.6 (requiring insurer to acknowledge receipt of notification of claim within thirty (30) days); Okla. Stat. tit. 36 § 1250.7 (setting forth requirements for insurer in denying or accepting a claim)).) In support of this position, Defendants cite various cases where a plaintiff was unable to recover on a legal malpractice claim because they were *in pari delicto* with the attorney defendant. (*See id.* 15-17 (citing, *inter alia*, *Heyman v. Gable, Gotwals, Mache, Schwabe, Kihle & Gaberino*, 994 P.2d 92 (Okla. 1999) and *Tillman v. Shofner*, 90 P.3d 582 (Okla. Civ. App. 2004)).

These cases are easily distinguishable from the instant matter, however, as the fault of the plaintiffs in those cases was clearly established. For example, in *Tillman*, the plaintiff's professional negligence claim was barred pursuant to *in pari delicto* when both the plaintiff and the attorney had pled guilty to criminal conspiracy to defraud the Internal Revenue Service and the United States Bankruptcy Court. *See Tillman*, 90 P.3d at 585. Further, in *Heyman*, the plaintiffs' legal malpractice claim was barred by *in pari delicto* after they had a verdict of fraud entered against them. The Oklahoma Court of Civil Appeals held that "[i]t would be contrary to public policy to allow [plaintiffs] to benefit from their own confirmed fraud and recover a monetary judgment from [their attorneys] to indemnify them for their fraud." *Heyman*, 994 P.2d at 94. In this case, however, Amica's degree of fault, if any, has not been established. The underlying suit was settled, and although Judge Eagan denied Amica's motion for summary judgment, such a denial does not amount to a finding of fault or liability on the part of Amica. Further, contrary to Defendants' assertion, there is nothing in the First Amended Complaint conclusively establishing Amica's degree of fault or violation of the statutes cited by Defendants in their motion. There is accordingly no basis for

this Court to dismiss Amica's negligence claim on the basis that Amica "knowingly participat[ed] in a transaction intended to accomplish a purpose forbidden by law." *Tillman*, 90 P.3d at 584-85.

V. **Indemnity Claim**

Amica contends that "in the event [Amica] and Defendants are deemed or found to have not been joint tortfeasors for purposes of [Section 832]," it is entitled to "common-law, implied indemnity from Defendants." (First Am. Compl. ¶ 35.) In support of such claim, Amica alleges: (1) "Defendants' actions, inactions, and advice with regard to the Cantrell claim were negligent or otherwise improper and erroneous," (*id.* ¶ 36); (2) "Defendants' actions, inactions, and advice with regard to the Cantrell claim were legally imputed to Plaintiff," (*id.* ¶ 37); (3) "[d]ue to Defendants' actions, inactions and advice, [Amica] was constructively liable to Cantrell for bad faith damages," (*id.* ¶ 38); (4) "[Amica] was potentially and/or actually liable to Cantrell for both coverage and bad faith damages," (*id.* ¶ 39); (5) the settlement between Amica and Mrs. Cantrell was "reasonable in both fact and amount," (*id.* ¶ 40); (6) "[b]ut for the actions, inactions, and advice of Defendants, the amount of settlement would have been significantly less than the amount ultimately paid," (*id.*); and (6) Amica's settlement with Mrs. Cantrell "extinguished any liability Defendants may have had to Cantrell," (*id.* ¶ 42).

"A right to implied indemnity may arise out of a contractual or a special relationship between parties and from equitable considerations." *See Daugherty v. Farmers Coop. Ass'n*, 790 P.2d 1118, 1120 (Okla. Civ. App. 1989). "In the case of implied or noncontractual indemnity, the right rests upon fault of another which has been imputed or constructively fastened upon he who seeks indemnity." *Id.* (internal citations and quotations omitted); *see Braden v. Hendricks*, 695 P.2d 1343, 1349 (Okla. 1985) (stating that Oklahoma "recognize[s] a right of indemnity when one – who was

11

only *constructively* liable to the injured party and was in no manner responsible for the harm – is compelled to pay damages because of the tortious act by another"). Therefore, "to seek indemnification, a party cannot have been actively at fault." *In re Cooper Mfg. Co.,* 131 F. Supp. 2d 1238, 1248 (N.D. Okla. 2001) (citing *Travelers Ins. v. L.V. French Truck Serv.*, 770 P.2d 551, 555 n. 16 (Okla. 1988) and *Porter v. Norton-Stuart Pontiac-Cadillac of Enid*, 405 P.2d 109, 111 (Okla. 1965)). Further, the Tenth Circuit has clarified that in order for a party to recover indemnification, the indemnifying defendant need not be directly liable to the injured party. *See In re Cooper Mfg. Co.*, No. 98-0580, 1999 WL 360173, at *2 (10th Cir. June 4, 1999) (reversing district court's holding that insurance company could not seek indemnity against its agent because it could not prove that agent was directly liable to insured); *In re Cooper Mfg. Co.*, 131 F. Supp. 2d at 1246 (discussing Tenth Circuit's holding in *In re Cooper Mfg.*, 1999 WL 360173) ("The Tenth Circuit held that in order to recover indemnification, an indemnitee [n]eed not establish direct liability between the indemnitor [a]nd the party to whom the indemnitee [w]as liable[.] According to the Tenth Circuit, an indemnitee [m]ay seek indemnification by establishing that the indemnitor's [a]cts directly caused the indemnitee [t]o become liable to a third party[.]").

Defendants move to dismiss Amica's indemnification claim because they contend that Amica "admit[s] to being at least partially at fault." (Mot. to Dismiss 12 (citing statement of law that a party seeking implied indemnification cannot have been actively at fault).) In support of this argument, Defendants cite to Paragraph 41 of the First Amended Complaint as an admission of fault by Amica. Specifically, Paragraph 41 of the First Amended Complaint states:

> Pursuant to *In re Cooper Manufacturing*, 131 F. Supp. 2d 1238 (N.D. Okla. 2001), [Amica] does not seek from Defendants . . . all amounts paid to settle the bad faith claim. Rather, [Amica] seeks to carve out any bad faith damages which are found to be attributable to its own conduct, and seeks to hold Defendants responsible only

12

>for those damages caused by their own negligent or otherwise improper advice, actions, and instructions.

Amica responds by also citing Paragraph 41 and argues that because it is seeking partial indemnification therein, as was permitted in *In re Cooper Manufacturing*, 131 F. Supp. 2d 1238, its claim is not subject to dismissal.

After review of the First Amended Complaint and *In re Cooper Manufacturing*, 131 F. Supp. 2d 1238, the Court agrees with Amica. First, the Court does not find that Paragraph 41 of the First Amended Complaint demonstrates an admission of active fault, as argued by Defendants. Paragraph 41 instead seeks to carve out any damages "which are found to be attributable" to Amica's conduct, therefore presumably leaving determination of Amica's fault, if any, to the jury. (First Am. Compl. ¶ 41.) Further, as noted by Amica, a court in this district has previously permitted the issue of partial indemnification to go to a jury in *In re Cooper Manufacturing*, 131 F. Supp. 2d 1238. Specifically, *In re Cooper Manufacturing* involved an indemnification claim by an insurance company against its agent in conjunction with a settlement paid by the insurance company to its insured for the insured's bad faith claim. The agent moved for summary judgment on the indemnification claim, arguing that the insurance company was directly at fault for the conduct underlying the insured's bad faith claim and was therefore barred from making a claim for indemnity. In response, the insurance company clarified that, similar to Amica's claim in this case, it was not seeking indemnification of the entire $7.5 million it had paid in settlement, but was instead seeking indemnification for only that portion of the settlement that was not attributable to its own conduct. The court denied summary judgment on the indemnification claim, noting that the ultimate apportionment of the $7.5 million would be a question for the jury. *Id.* at 1249. Further, the verdict form tasked the jury with apportioning the settlement amount within the indemnification claim. (*See*

Doc. 643 in Case No. 94-CV-901-H) (requesting jury to write in portion of underlying settlement that insurance company could recover from agent based on indemnity).)

Defendants have failed to provide any argument regarding *In re Cooper Manufacturing* in their reply brief and have not provided any case law suggesting that the type of apportionment in *In re Cooper Manufacturing* was in error. Without such argument or authority, and given the similarities between the indemnity claims in *In re Cooper Manufacturing* and this case, the Court denies Defendants' motion to dismiss Amica's indemnity claim.

**VI.    Conclusion**

For the reasons stated herein, Defendants' Motion to Dismiss (Doc. 17) is GRANTED IN PART and DENIED IN PART. Specifically, the Motion to Dismiss is granted as to Amica's contribution claim and denied as to Amica's professional negligence/legal malpractice and indemnification claims.

**IT IS SO ORDERED THIS 28th day of July, 2011.**

_____
**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**